**In re Harry C. DREIER, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 94–BG–1531.**

District of Columbia Court of Appeals.

Submitted Jan. 11, 1996.

Decided Feb. 5, 1996.

---

Before FARRELL, RUIZ, and REID, Associate Judges.

PER CURIAM:

The Board on Professional Responsibility (the Board) recommends the imposition of reciprocal discipline on respondent in the form of suspension for one year, prospective, with reinstatement conditioned upon a showing of fitness. In essence this recommendation tracks the discipline imposed on respondent by the Supreme Court of New Jersey on October 6, 1994, following its determination that respondent had engaged in misconduct including neglect, failure to deliver client property, failure to communicate with a client, and failure to cooperate with the disciplinary authorities. All of these charges arose from respondent's conduct as trustee in the administration of a New Jersey trust. Before the Board, respondent made no effort to show cause why identical discipline should not be imposed. See D.C.Bar R. XI, § 11(c). He likewise has filed no objections to the Board's recommendation.

The facts underlying the suspension are summarized in the Board's report, attached hereto, and need not be recited again. They demonstrate substantial negligence on respondent's part, as well as other violations, in regard to his handling of bonds belonging to

one of the beneficiaries of the New Jersey trust. We agree with the Board that respondent's conduct constitutes misconduct in the District of Columbia of the kind specified in the Board's report. We also accept the Board's recommendation as to sanction.

Accordingly, respondent Harry C. Dreier is hereby suspended from the practice of law in the District of Columbia for one year beginning with the date of this order.[1] Respondent shall furnish proof of rehabilitation as a condition of reinstatement. D.C.Bar R. XI, § 3(a)(2).

*So ordered.*

ATTACHMENT

### DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

IN THE MATTER OF:

HARRY DREIER

RESPONDENT.

BAR DOCKET NO. 460–94

*REPORT AND RECOMMENDATION*

On October 6, 1994, the Supreme Court of New Jersey suspended Respondent, Harry C. Dreier, from the practice of law in that state for a period of one year, effective October 31, 1994, and until further order of the court. Respondent has been a member of the Bar of the District of Columbia since April 18, 1980. Based on the New Jersey suspension, the District of Columbia Court of Appeals temporarily suspended him and directed that he show cause why reciprocal discipline should not be imposed.

In its Order suspending Respondent, the Court of Appeals directed the Board on Professional Responsibility either to recommend whether identical, greater or lesser discipline should be imposed on Respondent or to determine whether the Board should proceed *de novo* pursuant to Rule XI, Section 11. Respondent has not responded to the Order,

---

1. The suspension is prospective inasmuch as respondent has not filed the affidavit required by

D.C.Bar R. XI, § 14(g). *In re Slosberg,* 650 A.2d 1329, 1331 (D.C.1994).

nor has he challenged the imposition of reciprocal discipline. By defaulting, Respondent has admitted the existence of liability in a reciprocal case. *In re Goldsborough*, 654 A.2d 1285, 1287 (D.C.1995). We conclude that the misconduct upon which the New Jersey discipline was predicated does not warrant substantially different discipline in the District of Columbia, and recommend, therefore, that reciprocal discipline be imposed. Accordingly, we recommend that the Court of Appeals suspend Respondent from the practice of law in the District of Columbia for a period of one year and that he be required to demonstrate fitness as a condition of reinstatement.

## I. THE NEW JERSEY PROCEEDINGS

The New Jersey proceedings began on January 15, 1992 when Linore Aronson Brumley, the daughter of Respondent's client Sylvia Aronson, filed a grievance on her mother's behalf with the District XIII Ethics Committee (the "DEC") in connection with Respondent's handling of a trust. After unsuccessfully attempting to resolve the matter between January and June 1992, the DEC secretary forwarded it for investigation. Respondent failed to cooperate with the DEC during the investigation, and a formal complaint was filed and served on him on September 29, 1992. After a hearing based upon stipulated facts, the DEC found that Respondent had violated New Jersey Rules of Professional Conduct ("RPC") 1.1(b) (pattern of neglect), 1.3 (lack of diligence), and 8.1(b) (failure to cooperate with the DEC). The DEC recommended to the Disciplinary Review Board of the Supreme Court of New Jersey (the "New Jersey Review Board") that Respondent be publicly disciplined. Upon a *de novo* review of the record, the New Jersey Review Board concluded that the record did not support a finding of a

violation of RPC 1.1(b) (pattern of neglect), but it did support findings that Respondent had violated RPC 1.3 (lack of diligence), RPC 1.1(a) (gross neglect), RPC 1.4 (failure to communicate), and RPC 1.15(b) (failure to deliver promptly client property). The New Jersey Review Board also concluded that Respondent had violated RPC 8.1(b) (failure to cooperate with the DEC) because he failed to respond to inquiries when the DEC was investigating his conduct.

Noting that Respondent had twice before been publicly reprimanded for misconduct in an estate matter [1] and that he had failed adequately to cooperate with the DEC, the New Jersey Review Board recommended that Respondent be suspended for one year. Based upon the New Jersey Review Board's Decision and Recommendation (the "New Jersey Decision"), the Supreme Court of New Jersey suspended Respondent from the practice of law for a period of one year, effective October 31, 1994.

The facts underlying Respondent's suspension in New Jersey are set forth in the New Jersey Decision, and may be summarized as follows. In 1980, at the request of one of the beneficiaries, Respondent was appointed as trustee for the three-part trust created under the provisions of Arthur Aronson's will (the "Aronson Trust"). The decedent's wife, Sylvia Aronson, was the beneficiary of a trust for life ("Sylvia's Trust"), and the two children, Theodore Aronson and Elinor Aronson (now Linore Aronson Brumley) ("Brumley"), were each the beneficiaries of separate ten-year trusts with specific provisions ("Theodore's Trust" and "Brumley's Trust").

On March 29, 1986, Brumley filed an ethics grievance against Respondent, alleging lack of diligence and failure to communicate in connection with his handling of her trust. During the pendency of that grievance, which resulted in Respondent's 1990 public reprimand [2], Respondent retained Francis X.

---

[1] Respondent was publicly reprimanded on July 18, 1990, for lack of diligence as a trustee and failure to communicate with the trust beneficiary in connection with his handling of Elinor Aronson's (now Linore Aronson Brumley) portion of the Aronson trust. On February 9, 1993, Respondent was once again publicly reprimanded, this time for lack of diligence, failure to communicate, and failure to cooperate with the ethics authorities in connection with a different estate. Respondent had also previously been publicly reprimanded in 1983 for intentionally misrepresenting the status of a case.

[2] *See* note 1.

Hermes to represent him in connection with the grievance and also to serve as his lawyer with respect to the Aronson Trust. Hermes communicated with Brumley on Respondent's behalf with regard to her trust. Ultimately, the difficulties with the Brumley Trust were resolved[3], the Aronson Trust was terminated, with the final accounting for the trust being approved by the court by judgment on May 22, 1990. The judgment terminating the Aronson Trust required Respondent to distribute all funds remaining in the trust to the beneficiaries.

Included among Sylvia's Trust assets were two Ryan Mortgage Acceptance Corporation Bonds, both of which had been issued in Respondent's name as trustee and therefore required his signature for transfer. Because the bonds were issued in his name, Respondent also received the $320 interest payments paid on each of the bonds twice yearly, as well as the IRS 1099 form reporting the interest earned each year by the bonds. Respondent's difficulties with Sylvia's Trust, which commenced in 1989 and continued beyond the time the grievance was filed in January 1992, included his failure to forward the IRS 1099 forms reporting interest earned on the bonds to Sylvia Aronson after 1988, his failure to forward interest payments he received on the bonds to her after 1989, and his delay in transferring the bonds to her after the Aronson Trust terminated.

### A. Respondent's Failure to Forward Interest Payments to His Client

Respondent admitted that following his submission of the accounting on the Aronson Trust for court approval in 1990, he had received additional checks for interest on the bonds. Instead of forwarding those checks to Mrs. Aronson, Respondent placed them in his files, and did not inform Mrs. Aronson either that he had received the checks or that he was holding them in his files. When questioned at the DEC hearing about his failure to forward the checks, Respondent offered two explanations—first, that he had been advised by Hermes that once the ethics complaint was filed, he should take no fur-

ther action with regard to his trusteeship unless so directed by the Ethics Committee, the Disciplinary Review Board, or the court; second, that he had retained the interest checks because he was waiting for the bonds to be transferred to Mrs. Aronson.

### B. Respondent's Inordinate Delay in Transferring the Bonds to His Client Upon Termination of the Trust

Since the bonds had originally been issued in Respondent's name as trustee, and therefore required his signature for transfer or sale, Respondent had retained physical possession of them. However, during the pendency of the ethics proceeding in connection with Brumley's Trust, Respondent forwarded one of the bonds to Sylvia Aronson. The other bond remained in Respondent's files, where he did not discover it until some later time. The final accounting for the Aronson Trust was approved in May 1990. Although he knew that the bonds had to be transferred to Sylvia Aronson, and that in order to accomplish the transfer he had to sign both of the bonds, Respondent did not communicate directly with Mrs. Aronson regarding the return of the bond that he had forwarded to her. Instead, even though the Brumley Trust ethics matter had been completed a few days after the court's order to distribute the Aronson Trust assets, thus negating any purported impropriety in his communicating with Mrs. Aronson because of the ethics proceeding, Respondent persisted in relying on Hermes to serve as an intermediary regarding the transfer of the bonds to Sylvia Aronson. Indeed, Respondent and Hermes apparently engaged in a great deal of communication by letter, by telephone, and in person about the transfer, spanning almost a two-year period.

Moreover, although Respondent had one of the bonds continuously in his possession, he did not undertake to transfer that bond to Sylvia Aronson. Instead, he decided to wait until Hermes retrieved the other bond from Sylvia Aronson so that he could transfer them together. Respondent received a notice of redemption early in January 1992 and wrote to the bank at the end of January

3. There were no allegations of misconduct by Respondent in connection with Theodore's Trust.

requesting instructions on how to transfer the bonds to Sylvia Aronson's name. After receiving the bank's letter of advice dated February 13, 1992, Respondent wrote to Hermes, who then obtained the bond from Mrs. Aronson, and forwarded it to Respondent on March 27, 1992. When Respondent contacted Hermes in February regarding the transfer of the bonds, Respondent also enclosed a check from the bank in the amount of $1,600 representing interest payments from January 1990 through January 1992, to be forwarded to Sylvia Aronson.

Although Hermes' letter forwarding the bond was received in Respondent's office on March 30, 1992, Respondent did not send both bonds to the bank until May 4, 1992. When questioned as to why he had not taken any action with regard to the bonds between March 30, 1992 and May 4, 1992, Respondent explained that during that time period he had been coping with the death of his uncle/partner and handling the latter's cases.

Through no fault of the Respondent, the bank then lost one of the bonds, and as of the date of the DEC hearing the matter still had not been resolved.

In February 1993, the DEC hearing panel chair received two checks, both dated May 6, 1992—one in the amount of $6,312 and the other in the amount of $3,076, representing principal and interest on the Ryan bonds— from Respondent's counsel on behalf of Respondent, which were forwarded to Sylvia Aronson. The panel chair received another check, dated October 29, 1992, in April 1993 for $2,091.56. The May and October 1992 checks were reissues of old checks that had been sent to Respondent. When asked why he had held these checks in his file until 1993, Respondent testified that he thought that it was going to be a very short period of time before he would have the bonds back, and that he had intended to forward the interest checks to Sylvia Aronson together with the bonds. Respondent further explained that, during that period of time, he was dealing with the death of his uncle/partner, the dissolution of his partnership, another pending ethics matter, and a significant medical treatment.

## C. Respondent's Failure to Cooperate With the DEC

In June 1992, the DEC investigator, John Gallina ("Gallina"), wrote to Respondent requesting a written reply to the grievance allegations. When he had received nothing from Respondent by August, Gallina again wrote to Respondent on August 12, 1992, giving him seven days within which to submit his written reply. Respondent telephoned Gallina after receiving the latter's letter, and promised that he would provide the requested response. Gallina never received either a written response to the allegations [4] or any further verbal communications from Respondent. Respondent finally provided the DEC with a written response to the allegations in the grievance three days before the DEC hearing.

When questioned as to his failure to respond to the investigator's request for a written reply to the grievance allegations, Respondent testified that he had experienced difficulty in retaining counsel due to a large outstanding fee already owed for the prior matter and his counsel's unwillingness to enter an appearance until that sum was paid down. When asked why he had not contacted the DEC secretary or Gallina to explain the situation, Respondent claimed that he had decided to retain a certain attorney in whom he had confidence, but that obtaining the funds to retain the attorney had taken longer than he had anticipated.

## II. APPLICABLE RULES

### A. The Board's Authority Under Rule XI Section 11(c)

The imposition of reciprocal discipline is governed by D.C.Bar R. XI, § 11. Under

---

**4.** Although during the DEC hearing, Respondent produced a copy of letter dated August 17, 1992, which he stated had been prepared in response to Gallina's August 12, 1992 letter, he did not recall with certainty having mailed it. Moreover, Gallina testified that he had no recollection of having received it. In any event, the letter instead of responding to the allegations in the grievance, merely informed Gallina that Respondent had forwarded the bonds to the Bank for transfer and requested guidance as to what he should do with the interest checks that he had in his possession.

Subsection (c) of Section 11, reciprocal discipline is to be imposed "unless the attorney demonstrates, by clear and convincing evidence" that one of five conditions warranting different treatment in this jurisdiction exists. D.C.Bar R. XI, § 11(c). The rule thus "creates a rebuttable presumption that the discipline will be the same in the District of Columbia as it was in the original disciplining jurisdiction." *In re Zilberberg*, 612 A.2d 832, 834 (D.C.1992).

### B. Respondent's Misconduct Under Section 11(c)

The Board has no trouble concluding that the misconduct regarding neglect, failure to deliver client property, lack of diligence, failure to communicate with a client, and failure to cooperate with the disciplinary authorities, established in New Jersey as violating New Jersey RPC 1.1(a) (gross neglect), RPC 1.3 (lack of diligence), RPC 1.4 (failure to communicate), RPC 1.15(b) (failure to deliver promptly client property), and RPC 8.1(b) (failure to cooperate with the DEC), constitutes misconduct in the District of Columbia.

Respondent's unreasonable reliance on Hermes to communicate with his client, Sylvia Aronson, his failure to communicate with Mrs. Aronson regarding his receipt of bond interest payments from the bank and his holding those checks in his file until long after they became stale, his holding one of the bonds in his file for several years without transferring it to Mrs. Aronson upon termination of the Aronson Trust, and his lengthy delay in retrieving and transferring the other bond to her upon the trust's termination, would constitute violations of DR 6–101(A)(3) [5] (neglect), DR 9–103(B)(1) [6] (failure to notify promptly a client of the receipt of funds), and DR 9–103(B)(4) [7] (failure to deliver client property) for that portion of the

5. DR 6–101(A)(3) provides that "[a] lawyer shall not [n]eglect a legal matter entrusted to him."

6. DR 9–103(B)(1) provides that "[a] lawyer shall [p]romptly notify a client of the receipt of his funds, securities, or other properties."

7. DR 9–103(B)(4) provides that "[a] lawyer shall: [p]romptly pay or deliver to the client as requested by a client the funds, securities, or other

misconduct occurring prior to January 1, 1991.[8] *See In re Dreier*, 601 A.2d 1084 (D.C. 1992); *In re Dreier*, 651 A.2d 312, 314 (D.C. 1994). These same actions also constitute misconduct under Rules 1.3 (failure to act diligently and with reasonable promptness), 1.4(a) (failure to keep client reasonably informed), and 1.15 (failure to notify promptly client of receipt of funds and failure to deliver promptly funds or property to client) of the current Rules of Professional Conduct for that portion of the misconduct occurring after January 1, 1991.

Respondent's failure to cooperate with the disciplinary authorities in New Jersey in 1992 constitutes a violation of Rule 8.4 (conduct seriously interfering with administration of justice) in this jurisdiction. *See Dreier*, 651 A.2d at 314.

### C. The Appropriate Sanction

Respondent has made no effort to show cause why identical discipline should not be imposed, which is his burden pursuant to D.C.Bar R. XI, § 11(c). A one-year suspension is well within the range of sanctions for misconduct in this jurisdiction involving serious neglect and mishandling of client funds, as well as failure to cooperate with disciplinary authorities. *In re Mulkeen*, 637 A.2d 1143, 1144 (D.C.1994) (one-year suspension warranted for neglecting and mishandling client's funds); *In re Jones*, 544 A.2d 695, 697 (D.C.1988) (failure to seek client's lawful objectives, neglect and engaging in conduct prejudicial to the administration of justice warranted suspension of a year and one day when attorney had record of Bar discipline); *In re Alexander*, 513 A.2d 781, 783 (D.C. 1986) (neglect and inadequate preparation of client's case warranted suspension for a year and a day where attorney had record of prior discipline).

properties in the possession of the lawyer which the client is entitled to receive."

8. Because Respondent's misconduct commenced prior to January 1, 1991 and continued after that date, this case is governed both by the former Code of Professional Responsibility and the current Rules of Professional Conduct.

Moreover, since Respondent has not filed the affidavit required by D.C.Bar R. XI, § 14(g), the suspension from practice in this jurisdiction should be prospective, rather than *nunc pro tunc*. *In re Slosberg,* 650 A.2d 1329, 1331 (D.C.1994); *Mulkeen,* 637 A.2d at 1144. The Board recommends that Respondent be suspended from the practice of law in the District of Columbia for one year.

Finally, because Rule 1:20–21(a) of the New Jersey Rules of General Application requires that Respondent file a verified petition for reinstatement with the New Jersey Review Board, we recommend that a fitness requirement be imposed here. We believe that the New Jersey requirement is equivalent to a requirement of proof of fitness and that such a requirement is within the range of sanctions for this sort of misconduct in the District of Columbia. *In re Jones,* 544 A.2d 695 (D.C.1988) (per curiam) (attorney with record of prior discipline suspended for one year for neglect of legal matter and failure to cooperate with disciplinary authorities required to petition for reinstatement).

Board on Professional Responsibility

By: /s/_____
    Hamilton P. Fox, III
    Chair

Dated: _____

All members of the Board concur in this Report and Recommendation.